IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUTTE ENVIRONMENTAL COUNCIL,<br><br>        Plaintiff,<br><br>     v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES FISH AND WILDLIFE SERVICE; and City of REDDING,<br><br>        Defendants. | 2:08-cv-1316-GEB-CMK<br><br>ORDER |

Pending are cross-motions for summary judgment.  Plaintiff Butte Environmental Council ("BEC") seeks summary judgment on its claim that the United States Army Corps of Engineers ("the Corps") violated the Clean Water Act ("CWA") when it issued a Section 404 permit authorizing the Stillwater Business Park development project ("the Project"); and on its claim that the Corps' Environmental Assessment ("EA"), which found the Project would not have a significant impact under the National Environmental Policy Act ("NEPA"), violates NEPA because it contains an inadequate cumulative impacts analysis and the public did not have adequate opportunity to comment on the EA.  BEC also seeks summary judgment on it claims that

the United States Fish and Wildlife Service ("FWS") violated the Endangered Species Act ("ESA") by issuing an inadequate Biological Opinion ("BiOp") for the Project, and on its claim that the Corps violated that Act when issuing a Section 404 permit authorizing the Project based on the BiOp.  Defendants seek summary judgment on all of BEC's claims.

## Background

The Project is located in Shasta County, California, and will impact waters of the United States.  The City of Redding ("the City") is developing the Project in the Stillwater Plains area southeast of downtown Redding, California ("Stillwater site").  The Project's stated purpose is to enhance the City's economic stability by attracting business and industry, thereby improving the quality of life of unemployed and low-paid residents.  The Project will directly and indirectly affect critical habitats for the vernal pool fairy shrimp, vernal pool tadpole shrimp, and slender Orcutt grass.  Vernal pool tadpole shrimp are listed as endangered under the ESA, while vernal pool fairy shrimp and slender Orcutt grass are listed as threatened under the ESA.

In 2003, the City began drafting a joint Environmental Impact Statement and Environmental Impact Report ("EIS/EIR").  Draft EIS/EIRs were submitted to the Corps and the Environmental Protection Agency ("EPA") for comment.  On April 18, 2006, the City approved a Final EIS/EIR for the Project.  Thereafter, the City applied to the Corps for a permit under Section 404(b) of the CWA, as required by that Act, since the Project involves discharge of fill material into waters of the United States.  The Corps has the authority under the CWA to issue the permit provided the proposed project does not violate

the ESA. See 16 U.S.C. § 1536(a)(2). On December 18, 2006, the Corps issued a public notice that it would be evaluating the City's permit application for the Project.

The Corps entered into formal consultation with the FWS under Section 7(a)(2) of the ESA to evaluate whether the project would be "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical . . . " 16 U.S.C. § 1536(a)(2).[1] If the FWS determines under Section 7 the project is not likely to jeopardize the continued existence of the species or its critical habitat but may result in the incidental "take" of threatened or endangered species, it issues an "Incidental Take Statement" along with a BiOp. See 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 502.14(g)(4).[2] The Incidental Take Statement must specify "the impact of such incidental taking on the species" and "reasonable and prudent measures [considered] necessary or appropriate to minimize such impact . . ." 16 U.S.C. § 1536(b)(4).

---

[1] "The term 'critical habitat' for a threatened or endangered species means the specific areas . . . occupied by the species . . . found [to have] physical or biological features [ ] essential to the conservation of the species and [ ] which may require special management considerations or protection . . . " 16 U.S.C. § 1532(5)(A). "Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species . . . by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[2] The BiOp must include a "summary of the information on which the opinion is based"; "a detailed discussion of the effects of the [project] on listed species or critical habitat"; and "[FWS's] opinion on whether the action is [or is not] likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 502.14(h)(1)-(3). See also NRDC v. Rodgers, 381 F. Supp. 2d 1212, 1224 (E.D. Cal. 2005).

On December 27, 2006, the FWS issued a BiOp and Incidental Take Statement for the Project, in which it concluded the Project would not jeopardize the continued existence of, or adversely modify or destroy the critical habitat for the vernal pool fairy shrimp, vernal pool tadpole shrimp, and/or slender Orcutt grass. The FWS imposed several mitigation conditions upon the Incidental Take Statement to ensure that the City would to compensate for the critical habitat loss.  The Corps relied on the FWS's BiOp in determining that the proposed Project complied with the ESA.

On August 9, 2007, the Corps issued an EA and Finding of No Significant Impact ("FONSI") under NEPA, which was included in the "Department of the Army Permit and Evaluation and Decision Document" ("Decision Document").[3]  On August 21, 2007, the Corps granted a

---

[3]NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It is a procedural statute that requires the Federal agencies to assess the environmental consequences of their actions before those actions are undertaken. For "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), the agency is required to prepare an environmental impact statement ("EIS"). An EIS is a thorough analysis of the potential environmental impacts that "provide[s] full and fair discussion of significant environmental impacts and . . . inform[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Where an agency is unsure whether an action is likely to have "significant" environmental effects, it may prepare an EA: a "concise public document" designed to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . . ." 40 C.F.R. § 1508.9. If the EA concludes that the action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action. 40 C.F.R. § 1508.13. That is the route taken by the [Corps] for the [Project] at issue here. . . Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004)(internal citations omitted).

1 permit to the City under Section 404 which was also based on the
2 Decision Document.

### Standard of Review

"Judicial review of administrative decisions under the [CWA, ESA, and NEPA] is governed by the [Administrative Procedure Act ("APA")]. Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" W. Watersheds Project v. Matejko, 468 F.3d 1099, 1107 (9th Cir. 2006)(internal citations omitted). "In making this inquiry, [the court] ask[s] whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." Natural Resources Defense Council v. United States DOI, 113 F.3d 1121, 1124 (9th Cir. 1997)(internal citations and quotations omitted).

"Review under the arbitrary and capricious standard is deferential" to the agency. National Ass'n of Homebuilders v. Defenders of Wildlife, 127 S.Ct. 2518, 2529 (2007). A reviewing court should not vacate an agency's decision unless the agency: "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. at 2529-2530 (internal citation omitted).

/ / /
/ / /
/ / /

## Analysis

### Clean Water Act Claim

BEC argues it is entitled to summary judgment on its CWA claim since the Corps failed to adequately consider practicable alternatives to the Stillwater site before it issued the Section 404 permit. (Pl. Mot. at 14:14-19.) When evaluating a Section 404 permit application, the Corps must consider "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposal." 33 C.F.R. § 320.4(a)(2)(i).

> 40 C.F.R. § 230.10(a) provides that no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. A practicable alternative is one that is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. In evaluating whether a given alternative site is practicable, the Corps may legitimately consider such facts as cost to the applicant and logistics. In addition, the Corps has a duty to consider the applicant's purpose. Where a proposed project does not require access to water, i.e., it is not "water dependent," the availability of practicable alternatives is presumed." 40 C.F.R. § 230.10(a)(3).

Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs, 524 F.3d 938, 947 (9th Cir. 2008)(internal quotations and citations omitted).

The Project is not water dependent. The Decision Document states, "The basic purpose [of the Project] is economic development which is not water dependent." (Administrative Record ("AR") 545); Pl. Mot. at 13:15-16; Ds. Mot. at 13:15-16.) Therefore, it is presumed practicable alternatives to the Stillwater site exist. BEC

6

contends the Corps has not overcome this presumption, arguing the Corps did not adequately address concerns raised by the Corps itself and the EPA before selecting the Stillwater site as the "least environmentally damaging practicable alternative" ("LEDPA"). (Id. at 19-20:26-5.)

BEC cites to letters in the Administrative Record sent by the EPA and the Corps, in which the EPA and the Corps raise concerns about the Stillwater site as the LEDPA. (AR 1413, 911, 1414, 3112, 2205, 1426, 3115.) On April 29, 2005, the Corps sent a letter to the City commenting on the City's Draft EIS/EIR. (AR 3154-3155.) The letter stated:

> [Y]our preferred alternative [the Stillwater site] does not appear to be the LEDPA, as there may be less environmentally damaging alternatives for this project. The range of alternatives considered practicable in your Draft [EIS/EIR] does not include alternatives that avoid impacts to waters of the U.S., including wetlands, (waters) to the maximum extent possible. . . The screening criteria used for selecting practicable alternatives is still too restrictive to determine LEDPA and eliminates reasonable alternatives such as alternative 4. (Id.)

On June 23, 2005, the EPA also sent a letter to the City commenting on the Draft EIS/EIR:

> We recognize the efforts the City has made with refinements to their preferred [a]lternative[,] [the Stillwater site,] to minimize impacts to on-site aquatic resources. However, as we have discussed in writing and at our meetings, secondary and cumulative off-site impacts from the project remain of significant concern to us when considering this alternative. (AR 3112.)

The Corps counters it adequately considered practicable alternatives to the Stillwater site and addressed its own comments and those from the EPA regarding the Stillwater site. (Ds. Mot. at 13:7-13.) The Corps argues it "balanced the need to look at a reasonable

7

1  range of alternatives along with the applicant's [purpose]."  (Ds.
2  Mot. at 14:2-3.)  "In evaluating whether a given alternative site is
3  practicable, the Corps may legitimately consider such facts as cost to
4  the applicant and logistics.  In addition, the Corps has a duty to
5  consider the applicant's purpose."  Sylvester v. U.S. Army Corps of
6  Engineers, 882 F.2d 407, 409 (9th Cir. 1989).  The Corps argues that
7  in considering the Project's purpose, the Stillwater site emerged as
8  the LEDPA.

9         Further, the Corps cites to the Administrative Record as
10 demonstrative that it's own independent evaluation of the Project's
11 purpose led to modification of the City's original proposed purpose.
12 In 2003, the City stated, in a draft statement of the "Basic and
13 Overall Project Purposes," "The City of Redding has a need to develop
14 a business park that is capable of accommodating diverse
15 manufacturing, wholesale, food processing, information processing,
16 product distribution, and air cargo users."  (AR 3649.)  However, the
17 Corps stated in its Decision Document that the Project's purpose is
18 "to construct a medium to large sized regional business park with
19 associated roads, utilities and infrastructure within the City of
20 Redding's sphere of influence."  (AR 545.)  The Administrative Record
21 reflects this modification was a result of extensive communication
22 between the Corps, the EPA, and the City.  (AR 3647-3656; 3491-3510;
23 3522-3524.

24        The Corps argues it carefully evaluated and eliminated the
25 City's twelve proposed alternatives and a site it independently
26 selected.  (Ds. Mot. at 14:10-18.)  During its consideration of the
27 Project, the Corps evaluated a site that was not included in the
28 City's permit application, the Mitchell site.  (Id. 13:12-13.)  The

8

Decision Document explains, "the City could not justify the [12 million dollar] cost of the Mitchell Project" in 2006.  (AR 546.)  Further, "[t]he amount of property available [at the Mitchell site was] too small to achieve the overall project purpose."  (Id.)  This finding is substantiated by evidence in the Administrative Record; specifically on March 26, 2007, Nancy Haley ("Haley"), the Corps' Project Manager, sent an email explaining, "We are going to throw Mitchell out on cost and likely the fact that the park would be disjoined, therefore not feasible practically."  (AR 2005.)

The Administrative Record further shows several of the City's proposed sites were eliminated because they failed to meet the requisite criteria.  As the Decision Document explains:

> Six parcels were eliminated [ ] because they failed to meet one or more of 3 criteria.  The sites initially needed to be within the City of Redding or within the Sphere of Influence; have the ability to be competitive with other cities and counties to attract diverse businesses and industrial users; and have the ability to accommodate numerous businesses without displacing existing businesses and residences.  (AR 546.)

The Draft EIS/EIR prepared by the City in February 2005 explains how each of these sites did not meet one of the initial screening criteria.  (AR 675-680.)  The Decision Document further explains that five alternatives were eliminated for one of the following reasons: (1) the site was not available for acquisition; (2) the site may have resulted in adverse social or economic impacts on existing development;[4] (3) the site could not accommodate potential multiple

---

[4] The February 15, 2005 Draft EIS/EIR provides the following example of an adverse social or economic effect on existing development:  "The placement of a distribution center which operate[s] 24-hours per day adjacent to an existing single family residential development could result in potentially significant ambient noise increases, stationary
(continued...)

9

1 lot sizes; (4) the site was not capable of being served by the cities'
2 utilities; and/or (5) the site likely entailed unreasonable
3 development costs, meaning the costs exceeded the market value of the
4 developed property.  (AR 547; 681-689.)  The remaining alternative was
5 eliminated because it posed greater risks to wetland areas and
6 threatened or endangered species.  (AR 547.)
7         Additionally, the Corps cites to evidence in the
8 Administrative Record controverting BEC's argument that the Corps did
9 not adequately consider its own concerns, as well as those raised by
10 the EPA.  The Corps argues that not only did it modify the project's
11 purpose, thereby eliminating its own concerns that the City's proposed
12 purpose was too restrictive, it also eliminated "alternative 4" for
13 valid reasons, thereby addressing concerns raised in its April 29,
14 2005 letter.  (AR 3154-3155.)  In the City's Final EIS/EIR, dated
15 February 8, 2006, it explained alternative 4 was eliminated because
16 "[the] site is not practicable."  The City's "Preliminary 404(b)(1)
17 Alternatives Analysis," prepared in November 2006, further explains
18 that because 8,300 feet of a tributary to Stillwater Creek ran through
19 the center of the alternative 4 site, that tributary would need to be
20 filled in order to accommodate a contiguous 100 acre site.  (AR 2689-
21 2690.)
22         Further, the Corps cites to the Administrative Record as
23 demonstrative that the EPA's and it's own concerns were addressed,
24 specifically by comparing how the original plan was modified in

---

[4](...continued)
exhaust emissions while truck[s] are 'warming-up' and idling, glare from parking lot lights, potential conflicts with automobile traffic, and potential aesthetic impacts.  These impacts could affect property values, and general health and safety."  (AR 681.)

10

response to these concerns.  In a Supplemental Draft EIS/EIR, issued on September 16, 2005, the City details revisions made to the February 2005 Draft EIS/EIR which address the comments made by the EPA and the Corps in April and June 2005.  (AR 1327; 3154-3112.)  These onsite revisions included:

> [R]econfiguring areas and illustrative lots where development is permitted [ ] to site hydrology, hydrological connectivity, sensitive listed species, habitat quality and other biological related resources; eliminating road connections to the east; reducing the lengths of trails through wetland complexes; moving the 115kV electrical transmission line along the main road or into areas of less sensitivity; using stormwater BMP's to minimize impacts to receiving waters from the Project area; preventing development site run-off from entering the existing horseshoe pond; and, creating an easement or other land use restriction along the northern and eastern boundaries to prevent any infrastructure or development connectivity to the north and east.  (AR 1314.)

Additionally, the Corps' cites to direct impact tables showing that consultations between the Corps and the City led to a reduction of direct impacts by 0.83 acres between February and March of 2007.  (AR 2013-2041, 2042-2070, 2012, 2172.)

"[T]he record reflects [ ] the Corps made the proper analysis and weighed the correct factors in making its determination that no feasible alternatives [to the Stillwater site] existed.  The Corps did not err by taking [ ] costs into account.  The regulations explicitly charge the Corps with taking cost, existing technology and logistics in light of overall project purposes.  40 C.F.R. § 230.10(a)(2)."  Friends of Earth v. Hintz, 800 F.2d 822, 833 (9th Cir. 1986)(upholding the District Court's determination that the Corps' practicable alternatives analysis was proper; and further, affirming the Corps' decision to eliminate four proposed site alternatives).

1 Therefore, the Corps was neither arbitrary nor capricious when
2 "rationally conclud[ing]" the Stillwater site was the LEDPA. Id. at
3 834. Accordingly, this portion of Defendants' cross-motion is
4 granted.

Endangered Species Act Claim

BEC seeks summary judgment of its ESA claim, arguing FWS's determination in the BiOp that there would not be adverse modification to critical habitat was arbitrary and capricious. (Pl. Mot. at 28:4-9.)[5] "[The court's] review [of a BiOp] is 'narrow' but 'searching and careful,' and [ ] must ensure that the FWS's decisions are based on a consideration of relevant factors and [ ] assess whether there has been a clear error of judgment. The FWS must state a rational connection between the facts found and the decision made." Gifford Pinchot Task Force v. United States Fish & Wildlife Serv., 378 F.3d 1059, 1065 (9th Cir. 2004)(internal citations omitted).

FWS's BiOp concluded "that the proposed [P]roject would not result in the adverse modification or destruction of critical habitat for vernal pool fairy shrimp, vernal pool tadpole shrimp, or slender Orcutt grass." (BiOp at 29.) BEC challenges this finding, citing to language in the BiOp's conclusion indicating that the Project would result in adverse modification to the respective critical habitats:

> However, the proposed project would contribute to a local and range-wide trend of habitat loss and degradation, the principal reasons that the valley elderberry longhorn beetle, vernal pool fairy shrimp, vernal pool tadpole shrimp, and slender Orcutt grass were federally-listed. The proposed project will contribute to the fragmentation and

---

[5]At oral argument on December 15, 2008, Plaintiff stated it was only challenging the "adverse modification" finding of the BiOp and not the "no jeopardy" finding; accordingly, only FWS's "adverse modification" finding is addressed.

12

> reduction of the acreage of the remaining listed vernal pool species habitat located in critical habitat, the Redding Core Recovery Area, and throughout the range of these federally-listed species.
>
> The proposed project would also directly and indirectly affect hundreds of acres of upland habitat that supports the aquatic habitat that is required for the survival of the three vernal pool species addressed in this biological opinion.

(BiOp at 30.)  BEC argues this concluding language bears no rational connection to the BiOp's ultimate conclusion. (Pl. Mot. at 26-27.)

BEC further cites to the BiOp's findings on the Project's impacts on critical habitat. (Pl. Mot. at 26.) The BiOp found the Project would result in the destruction of 234.5 acres, 5.4%, of vernal pool crustaceans in units 1 and 5 of protected vernal pool crustacean critical habitat. (BiOp at 27.) Further, the BiOp found the Project would result in the destruction of 242.2 acres, 3.7%, of unit 2 of protected slender Orcutt grass critical habitat. (BiOp at 28.) Additionally, the Project would destroy 356.6 acres of vernal pool crustacean critical habitat uplands and 242.2 acres of slender Orcutt grass critical habitat uplands. (Id. at 27-28.)

Defendants rejoin the FWS's determination that the Project would not adversely modify critical habitat for the respective species was reasonable and seek summary judgment on BEC's ESA claim. (Ds. Mot. at 27:15-19.) Defendants argue FWS reasonably relied upon mitigation measures to be imposed upon the City when making its no adverse modification determination. (Ds. Mot. at 22:1-2.) The BiOp contains proposed conservation measures for the vernal pool fairy shrimp, vernal pool tadpole shrimp, the slender Orcutt grass, and their critical habitat. (BiOp at 10-12.) Preservation would occur at both on and off site locations and would range in preservation ratios

13

1 from 1:1 to 4:1 (<u>Id.</u>)  The Incidental Take Statement's "Terms and
2 Conditions" require the City to adhere to the BiOp's conservation
3 measures and also imposes several conservation measures prior to the
4 Project's start.  (BiOp at 32-33.)
5      In <u>Selkirk Conservation Alliance v. Forsgren</u>, 336 F.3d 944,
6 956 (9th Cir. 2003), the Ninth Circuit held:

> If a Conservation Agreement is in place, then the reviewing agencies ought to consider it when evaluating the impact of the proposed action. It is also relevant to know that the Agreement imposes enforceable obligations on the parties, to assure that the proposed mitigation measures will actually be implemented.  Accordingly, it was proper for the Forest Service and Fish & Wildlife to consider the Conservation Agreement when evaluating the Stimson Project.

13 Therefore, under the ESA, it is reasonable for FWS to take into
14 consideration mitigation measures when making a "no adverse
15 modification" determination.  Even though the Administrative Record
16 "makes it clear" that there will be negative impacts on critical
17 habitat, "[t]he same record [ ] evaluates in some detail the ways in
18 which these impacts will be mitigated by compensation measures. . ."
19 <u>Hayward Area Planning Association</u>, 2004 WL 724950 *7 (N.D. Cal.
20 2004)(holding the "dedication of 1,197 acres for the preservation and
21 management of whipsnake critical habitat for the benefit of the
22 whipsnake and frog" was rationally taken into account by FWS in
23 determining there was no adverse modification of critical habitat in
24 its BiOp).  Additionally, the Administrative Record shows the
25 enforceable mitigation is "rationally related to the level of take
26 under the plan" as required under 16 U.S.C. § 1539(a)(2)(B)(ii).
27 <u>Nat'l Wildlife Fed'n v. Norton</u>, 306 F. Supp. 2d 920, 928 (E.D. Cal.
28 2004).  The Incidental Take Statement issued by the FWS in this case

"imposes enforceable obligations on the parties, to assure that the proposed mitigation measures will actually be implemented." Selkirk, 336 F.3d at 956.

Defendants further argue that the FWS reasonably based its "no adverse modification" determination on the entire critical habitat for the respective species. (Ds. Mot. at 26-27:22-5.) The BiOp, in analyzing the status of the respective species, states there are 35 critical habitat units designated for vernal pool fairy shrimp, totaling 597,821 acres; 18 critical habitat units designated for vernal tadpole shrimp, totaling 228,785 acres; and six critical habitat units designated for slender Orcutt grass, totaling 94,213 acres. (BiOp at 16, 19.) The ESA Section 7 Consultation Handbook states:

> Adverse effects on individuals of a species or constituent elements or segments of critical habitat generally do not result in jeopardy or adverse modification determinations unless that loss, when added to the environmental baseline, is likely to result in significant adverse effects throughout the species entire range, or appreciably diminish the capability of critical habitats to satisfy essential requirements of the species.

See also Gifford Pinchot Task Force v. United States Fish & Wildlife Serv., 378 F.3d 1059, 1075 (9th Cir. 2004)(stating "The BiOps considered the important local effects, analyzing critical habitat more broadly when individual effects were not important").

In light of the enforceable mitigation measures and the permissible broader analysis of critical habitat, the BiOp does state a "rational connection between the facts found and the conclusion reached." Id. at 1065. Accordingly, this portion of Defendants' cross-motion is granted.

National Environmental Policy Act Claim

BEC argues it is entitled to summary judgment on its NEPA claim since the Corps failed to take a "hard look" at the cumulative impacts of the Project on critical habitat of the threatened and endangered species involved in this litigation. (Pl. Mot. at 31:4-10.)

> Courts apply a "rule of reason" standard in reviewing the adequacy of a NEPA document. Through the NEPA process, federal agencies must "carefully consider[] detailed information concerning significant environmental impacts," but they are "not require[d] to do the impractical." Alternatively phrased, the task is to ensure that the agency has taken a "hard look" at the potential environmental consequences of the proposed action.

Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004)(internal citations omitted).

BEC argues the cumulative impacts analysis contained in the EA was not thorough enough and did not adequately address previous concerns raised by the EPA with respect to the cumulative impacts analysis. (Pl. Mot. at 30-31.) The Decision Document cites to and relies upon the cumulative impacts analysis from the City's EIS/EIRs; and incorporates by reference the February 15, 2005 draft EIS/EIR; the September 16, 2005 supplemental draft EIS/EIR; and the April 2006 final EIS/EIR. (AR 557-558; 544.) BEC cites to a November 14, 2005 letter from the EPA, in which the EPA raises concerns about a draft EIS/EIR's cumulative impacts analysis. (AR 1430; Pl. Mot. at 30:8-12.) The pertinent comments are as follows:

> Finally, in our previous discussions with the City and in our comments on the [Draft EIS/EIR], EPA expressed the importance of a substantive-cumulative impacts analysis for the proposed

16

>           project stemming from past and reasonably
>           foreseeable development projects in Shasta County
>           which will collectively impact important natural
>           communities.  Although the supplemental [Draft
>           EIS/EIR] includes additional information on other
>           projects in the area, the document does not
>           justify the determination that there would be no
>           cumulative impacts to groundwater, surface water,
>           habitat or air quality, as a result of these
>           developments.  (AR 1430.)

BEC argues the Final EIS/EIR did not address the EPA's concerns which were raised in this letter.  (Pl. Mot. at 30:15-19.)

        The Corps counters the City's Final EIS/EIR did address the EPA's concerns about its cumulative impacts analysis.  (Ds. Mot. at 29:13-15.)  Later drafts and supplements to the EIS/EIR included a comprehensive table of projects in the area which would be expected to contribute to the cumulative impacts of the Project.  (AR 1473-1474.) Modifications were also made to the site as evidenced by the City's changes to the Project:

>           [The Project site,] as modified, will no longer be
>           hydrologically connected to the Stillwater Plains
>           Mitigation Bank which would preclude hydrologic
>           impacts from occurring.  The Proposed Action also
>           includes a measure to ensure that development in
>           the Stillwater Plains ecosystem will not occur as
>           a result of the Project by creating easements that
>           prevent the extension of infrastructure to the
>           north, east, and southeast. . . As identified in
>           the [supplemental draft EIS/EIR,] the Project will
>           create buffers that preclude development from
>           extending northward or eastward into the
>           Stillwater Plains Conservation Area. (AR 1453-
>           1454.)

Additionally, the Corps cites to the Administrative Record as demonstrative that it independently advised the City on its cumulative impacts analysis, further satisfying the requirement to take a "hard look" at the cumulative impacts of the Project.  (Ds. Mot. at 30:15-19.)  On September 29, 2005, Jonathan Foster, a Corps' employee, sent an email to the City commenting on the September 16, 2005 supplemental

draft EIS/EIR. (AR 1436-1436.) This email provided guidance to the City on how to analyze the Project's potential cumulative impacts. (Id.) In a June 2007 letter, Haley further explained the Corps was considering the cumulative impacts of "reasonably foreseeable" projects. (AR 1768-1769.)

The Administrative Record shows the Corps took the requisite hard look at the cumulative impacts before issuance of the EA and FONSI. BEC has not met its burden to show that the Corps' actions with respect to cumulative impacts were "arbitrary and capricious." See Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 764 (9th Cir. 1996)(stating "Plaintiffs have advanced no proof why this decision is arbitrary and capricious, as is their burden"). Therefore, this portion of Defendants' cross-motion is granted.

BEC also seeks summary judgment on its NEPA claim contending the Corps failed to provide the public with notice and an opportunity to comment directly on the EA and FONSI prior to the Corps' issuance of these findings. However, as the Ninth Circuit recently held:

> [T]he circulation of a draft EA is not required in every case. We do not say that it is always required or that it is never required. Instead, we stress that the regulations governing public involvement in the preparation of EAs are general in approach, see 40 C.F.R. § 1506.6, requiring the circulation of a draft EA in every case would apply a level of particularity to the EA process that is foreign to the regulations. Also, requiring the circulation of a draft EA in every case could require the reversal of permitting decisions where a draft EA was not circulated even though the permitting agency actively sought and achieved public participation through other means. The regulations do not compel such formality. See 40 C.F.R. § 1508.9. . . .
>
> "The way in which the information is provided is less important than that a sufficient amount of environmental information--as much as

18

> practicable--be provided so that a member of the public can weigh in on the significant decisions that the agency will make in preparing the EA." Stated another way, we now adopt this rule: An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.

Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs, 524 F.3d 938, 953 (9th Cir. 2008)(citing Sierra Nev. Forest Prot. Campaign v. Weingardt, 376 F. Supp. 2d 984, 991-992 (E.D. Cal. 2005).

The Administrative Record shows the public had opportunities throughout 2001-2007, the time period within which the Corps and City were evaluating the Project, to "weigh in with their views." Bering, 524 F.3d at 953. The Administrative Record shows public meetings were held on the following dates: April 4 2001; August 12, 2003; June 2, 2004; October 26, 2005; October 24, 2005; April 11, 2006; and April 18, 2006. (AR 2917.) Further, on December 18, 2006, the Corps solicited public input through a Public Notice "advising all interested parties of the proposed activity" for which the Permit was sought; and further, requesting comments be submitted by January 16, 2007. (AR 1646.) The Corps received three letters in response to the Public Notice, including a letter from BEC. (AR 2224-2229.) These letters were addressed in the Decision Document. (AR 562-566.) In a June 7, 2007 letter, sent in response to an inquiry regarding public meetings, Haley explained:

> The City of Redding held several public hearing[s] for this project between April 2001 and April 2006 . . . In this instance, because so many public hearings were already held for this project and because the level of impacts to waters of the United States, including wetlands, were so minimal

        in light of the acres of wetlands preserved on the site, the Corps determined no hearing was necessary. (AR 1769.)

Therefore, in the totality of circumstances, the Corps provided sufficient opportunity to the public to comment before issuing the EA and FONSI; and, accordingly, this portion of Defendant's cross motion is granted.

## Conclusion

For the reasons stated, Defendants' cross-motion for summary judgment is granted and BEC's motion is denied. Judgment shall be entered in favor of Defendants.

Dated: January 20, 2009

_____
GARLAND E. BURRELL, JR.
United States District Judge